I promise to take the pace of the morning call 207-1037 between the state of Illinois v. Rubio. On behalf of the F1, Ms. Sharon Shanahan, on behalf of the F1, Mr. Markey, you are dismissed. Ms. Shanahan? Mayors of this court, counsel, my name is Sharon Shanahan and I represent the people of the state of Illinois. On the night of June 2, 2005, a train arrived in Rockport. It had started in Arizona, traveled through Denver, and arrived in Rockport during the night. The train had made the trip before. The train consisted of a truck and an SUV full of marijuana. According to the prosecutor, the amount of marijuana was worth approximately $1 million. Diligent police work had uncovered this illegal train and led to the arrest of the participants. But the trial court suppressed the evidence of the search and as a result of that decision, the state brings this appeal. I think it's important to note that the hearings on these motions took place on seven separate days and took 16 months to complete. There were three attorneys present at each hearing with each questioning each witness about their own defendant. The trial court described the hearing as the most disjointed hearing I've ever participated in. And it is this conclusion that I believe led the trial court to overlook critical evidence and the trial court also applied outdated law. And as a result, the trial court erroneously granted the defendant's motion to suppress. Counsel, it sounds like you're saying as a matter of convenience the court just granted the motion because it didn't want to deal with this anymore. Is that what you really mean? Oh, no, Your Honor. I'm just saying they went on forever and ever and ever. That was his quote that it was the most, a direct quote, the most disjointed hearing I've ever participated in. I don't mean that because it was disjointed. I'm saying I think because it was disjointed, because it took such a long time, quite honestly, the trial court didn't remember some of the evidence, some of the crucial evidence, and didn't consider it, as we will see in one of my later issues. Well, one of the points that I think he did remember or I think that was referenced to is the officer who stopped the car. Well, I didn't really know what I was stopping before. I was just told to stop it if I saw something. I mean, that looks like they're really just fishing to try to get something that they can use to go on with their investigation. And the officer is quite honest about this. That's correct. However, the police officer was obviously told don't stop him unless he commits a traffic violation. He did commit two traffic violations to the stop. I don't think there's any doubt of that. No one argues that the stop, initial stop, was not valid. Whether they wanted to talk to him about something else is under the law that we are under now and the law that the trial court did not apply. It's not immaterial. In People v. Harris and People v. Cosby, it's very clear that a detention that the fact that the detention is not related to the circumstance of the stop doesn't matter. That's probably what happened to the trial court in the 16 or 18 months or whatever during that time. I mean, this law was in flux during that time, going from Brownlee to Cosby. So, you know, Brownlee and Gonzalez to Cosby. But the trial court seemed to be – I agree with, to some extent, the scope aspect the trial court relied on initially and then was presented with some case laws that was changing in the motion to reconsider that came off that a little bit. But in both of those rulings, the trial court focused also on duration of the stop, and that hasn't changed. Okay, that's my next point. So why don't we talk about duration? Yes. The trial court said an hour traffic stop for tickets to give left-turn signaling and no valid driver's license and no valid proof of insurance was excessive, just period, the end. But this was not an ordinary traffic stop. It was complicated by a number of things. First of all, the only thing that Mr. Espinosa presented to the traffic officer was a Mexican driver's license. Now, you cannot drive in the United States on a Mexican driver's license. Now, you outline all these things very well in your brief, in which we've all read. As far as all the different things that happened during the stop that you say prolonged the stop and made it reasonable. But, I mean, the trial court heard all those things. Those things were argued to the trial court, I'm assuming. And it just appears to me, based on the rulings and everything that I've read, that the trial court just didn't buy the police explanation as to why this took so long. Some of the factors the court considered was the pretextual nature of the stop, and also maybe a little bit the contradictory testimony as to whether Spades told Branham about why he should stop the car and all that stuff. But factoring everything into it, it just appears to me that the trial court didn't buy the state's explanation as to why it took so long. But now you're asking us to buy it when the trial court didn't buy that. I think that's a pretty valid summary of the thing. What's the standard of review for us to reverse the trial court? In this case, the standard of review would be the ‑‑ hang on a minute here. It's manifest weight, so the burden is on us to prove that the decision was manifestly erroneous. I think when you look step by step, and keep in mind, even this testimony of the stop is segmented and didn't come in in just one testimony. But we have a stop. We have, well, this person doesn't have a valid driver's license. He's driving someone else's car. He doesn't know the address of the house he just came from. He has no proof that he has the right to drive this car. He says he's from Colorado, but he presents no proof that he's from Colorado or an address in Colorado. He has a middle name that has an unusual spelling. Therefore, we have to run in Illinois the check of does he have a valid driver's license in Illinois? Did he ever have a valid driver's license in Illinois? Does he have a valid driver's license in Colorado? Did he ever have a driver's license in Colorado? Whose car is this? I mean, it really could be a stolen car. You've got somebody with a Mexican driver's license, no other proof of ownership. He's just come from a house. They know the house he came from. What's the address of your house you're staying at? I don't know the address of the house I'm staying with. I think Espinosa's driver middle name is very odd. If you look at the Sanchez case that I cited in my brief, I think it's very similar. They had a 45-minute stop there, and they pointed out a lot of the same thing. There was an Arizona ID in Missouri. The people couldn't clearly state where they were going. The Sanchez court says that the majority of the 45-minute encounter was spent completing the traffic stop, including the time spent to confirm the identity of Sanchez based upon the suspect ID he provided, and certainly Mr. Espinosa presented a suspect ID. Well, if you – I mean, if the issue is how much time did it actually take, why wasn't there testimony about the chronology of the checking rather than just throwing all of the factors at the fan and seeing which one of them stuck? Well, the arresting – Especially in light of the law as it is changing during this period of time. Well, the officer does pretty well testify as to the sequence of the stop, and his testimony is confirmed by a couple of the other police officers that were present at the stop. I think a very important thing to consider here is that the state police – well, the police officers involved in this case had nothing to gain and everything to lose by extending the length of this court. A police officer knows that the surest way that he's going to get his traffic stop thrown out is to extend it too long. They have every reason to end a traffic stop in a timely manner. The law – Detective Spades had been working on this case for a long time. He is three blocks away. He is in constant conversation with the police officers, maybe not directly, but from Detective Spades to Detective Russo and Detective Viola, who were both there watching everything. He can be there in minutes. He can do what he wants to do in this case, which is talk to Mr. Espinosa. He certainly doesn't want a police officer that knows nothing about this case going into detail with Mr. Espinosa about the stop. He wants to get that traffic stop over with, and there is absolutely no reason whatsoever why the police would have extended the stop any more than they had to. This is just a weird case with a Mexican driver's license, but he says he's from Colorado, but he doesn't have any Colorado identification, but he's in Illinois driving an Illinois car, but he can't tell you anything. He can't tell you where the person is that owns the car. He can't tell you the address of the place he came from. It just took a while to get to the testimony. There are, as I noted in my briefs, lots of cases that take an hour for a traffic stop to get through all of the – Well, and be that as it may, since there are cases of that nature, don't we then really have to look at what the trial judge says, and he is suspicious, and why should we disavow that? He is suspicious because he thought that Detective Branham was intentionally keeping him at the scene so that Detective Spades can get there, and that doesn't make sense. Detective Spades is not on the other side of town. Detective Spades is not involved in anything else other than sitting at the house where Mr. Espinosa originally left it to make sure no one else is coming out of it and waiting for the police stop to be over. That doesn't make sense. Yes, the trial court says, I am suspicious that he is intentionally keeping Espinosa at the scene waiting for Detective Spades to return. Detective Spades is waiting for the stop to be over so that he can – and if you notice the timing, immediately upon completion of the stop, he's there. Wasn't there conflicting testimony as to whether the stop was actually over? There is conflicting testimony as to whether he arrived at the time he's there, and Detective Branham – I mean Sergeant Branham is giving the tickets, and then he goes and talks to him, or whether he actually arrived after the tickets had completely been given. But certainly the record of Russo and Spades and Branham all looked at together clearly indicate that it was – all we can say is right at the same time he may have been there. But I think it is very clear that in any case he did not talk to Mr. Espinosa until the traffic citations had been given to him, his driver's license had been returned to him. I thought Branham was unclear on whether or not he had given the citations before Spades approached him. His first statement that he gave in court is a little bit questionable, but I think he cleared it up quite clearly later on in his testimony where he said that it was – the second he said that he issued the tickets after Spades arrived, but before Spades talked to Espinosa. That was his second statement, and his third statement was that he issued them close to the same time as Detectives started to talk to him. So I think he clarified his statements on the time, and I would note that both Detective Russo and Detective Spades confirmed – independently confirmed the fact that they did not speak to Mr. Espinosa until the traffic tickets were issued. Notably, he is free to go at that time. He can't drive that car off because, number one, he doesn't have a valid driver's license, and number two, we still haven't quite figured out how he got that car. We can't reach – they couldn't reach the owner of the car. He didn't know anything about the car. So he is – I think he is – the seizure has definitely ended. He has the tickets. He has his Mexican driver's license for what good it will do him. The other papers that he had presented to the police officers, as I say, he can't drive away. Didn't Espinosa testify that he did not have his documents back before the Spades talk to him? Yes, he did. Did the court make any findings of fact on that point? I'm not sure. In these cases, you start to talk about all the different time frames of different traffic stops. Those are all affirmances of trial court's findings that the stops were not too long, that they were appropriate. Correct. And again, that's a manifest weight. The trial – the appellate court looking at the trial court's reasoning for why that was, it's a manifest weight. It doesn't mean that they are not – they stand for the point that lots of courts have said it takes 45 minutes. It's not unusual for it to take 45 minutes or an hour to do a complicated stop. I think the thing that's interesting about those cases is that they do deal with complicated stops. They don't just deal with simple stops. Del Rio, presented by the defendant in his brief, was a pull-up running through the federal database. Oh, my gosh, there he is. No two states involved. No missing driver's license involved. No, I mean, anything. It was just right there. This had a lot of – we have lots of states, lots of names, lots of places. Two different things that he had to check. One, it's two different computer checks to check for the driver's license. It's an entirely separate check to check for a – if there are any warrants or anything. Those had to be done both in both states. So I think those cases are instructive in that they point out we think this is a valid time to consider because look at all the things that they had to do. And that's why I feel they're useful. Can I ask one quick question about the second issue? The second issue, you indicated that – actually, the trial court, and then you picked it up in your brief. And you seem to focus on whether the defendant was seized or not regarding the voluntariness of the consent. And certainly whether someone's in custody has been seized by the police is a factor to be considered. But it almost seems like you're arguing that the case turns on whether he was seized or not. And maybe I'm wrong, but isn't it the totality of the circumstances, including his age and whether his role was overborne to that, whether he felt free to not consent to the search? Absolutely. So seizure is just one factor to be considered, correct? I think the place where the court erred here is in focusing almost exclusively on the fact that we had a person that was a native Mexican speaker. And his conclusion about the seizure, I mean, that he was seized, indicates that he points out limited English-Mexican citizenship, the lack of an interpreter, and the failure to provide a consent in Spanish. Those are the only things he mentioned. And I feel and I believe that – He mentioned a number of officers present. He mentioned more of them. He mentioned that he was now informed he was free to go. I mean, he mentioned no Marianas. He mentioned a lot of things other than just what you pointed out. Yes. I believe I have responded to all of those in my brief. He was wrong about the number of police officers that were present. There were, for the first 10 minutes, there was only one police officer there. Then Officer Viola arrived, but he never actively participated in the arrest. He was kind of parked off to the side. When Officer Russo was parked in sight of the location, but he indicated almost three blocks away, I believe, at least two blocks away. So for the first 10 minutes, there's none. For the second 10 minutes, Officer Viola is there but not necessarily participating in this. When Officer Russo arrived, Officer Viola left. So we now have, at the most, Officer Russo, Officer Spades, and the arresting officer, who basically said, this is Detective Russo and Detective Spades. They would like to talk to you. Will you talk to them? And then you don't hear a word from the arresting officer again. So give her down to two police officers. I don't see any of the—and keep in mind, I want to return, if you'll give me time. I know I'm over. The standard here is a reasonable person. The standard here is not a reasonable Mexican who has lived in the United States for 20 years. And he has lived here for 20 years. He's had driver's license. He's had prior tickets. He knows when a stop is over. He knows he spoke to four different police officers in English at length. But the standard is the standard of a reasonable person, not a reasonable Hispanic person. And as I said, we've gone through the mental factors in the state's brief. There is no indication that any of the other factors apply. I need to understand, is a reasonable Hispanic person abnormal or subnormal to a reasonable person? It's the same. Is the same only different? No, I'm saying, you say, the standard is, would a reasonable person in the same position as this person feel he was free to leave? And the fact that this, that a person had been born 40 years earlier in Mexico shouldn't interrupt that standard. I thought you said we're supposed to be dealing with this as what a reasonable Hispanic person. I'm saying a reasonable person is a reasonable person, whether they are Hispanic, Italian, Mexican. I misunderstood you. I thought you were actually saying that, similar to malpractice, that there are different standards. There's a reasonable practitioner in the medical arts, psychiatric, et cetera, is different than the reasonable standard for a layman. And I was under the impression you were saying that a reasonable Hispanic was different from a reasonable. Absolutely not. I think the court did. Oh, you think the court did? Yes. Okay. I think the court treated this defendant as, well, what would a reasonable Hispanic who spoke English as a second language? And I don't think that's the standard. I think the standard is, what would a reasonable person do? I also think the trial court greatly overlooked Mr. Espinosa's experience in the United States, having lived here for 20 years. He said he'd been in Colorado for 15 years. Before that, California and Washington. He's been stopped. He's received tickets. He speaks quite fluent English because three police officers describe a litany of things that he told them in English long before he ever said, oh, by the way, I don't speak very good English. He is a reasonable man. And the reasonable man standard applies. It's not a reasonable man that's only been speaking English for 20 years. We have three distinct issues, two dealing with the house, and we're trying to argue them distinctly. But at the end of the first argument of the issue, you said, well, he's got his documents back, and we'll assume that for purposes of my question. But we still don't know where he's going to go because we still have a problem with who owns the car. We have lots of, you know, he may be free to go, but does he really know that? Because if they're still wondering who the car belongs to or how he got in the car, I mean, those questions are still ongoing, aren't they? Well, first of all, I would note that, as I said, he has had traffic tickets before, and he knew or should have known that once you are given the traffic tickets and given your documents back, he was given his license back. He had some other papers, I believe. He knows from his prior experience that when you get those back, the traffic stop is over. Okay, so the Rockford police are going to let him walk away with maybe even though he's a car thief? He's three blocks from home. He certainly knew that he was free to leave at that point in time. There have been no allegations about that he's a car thief. There's none whatsoever. It simply was not his car, and he had no driver's license, so he could not drive the car. But he certainly could have. As I said, a defendant cites one case where someone says, oh, yeah, you're free to leave. Of course, you happen to be standing in the middle of an interstate, and it's 30 miles to the next exit. That's not the situation we're in here. The situation we're in here is where the defendant is three blocks from home. Were any of the keys on that key ring used to open any doors at that house? Yes. Even though they went in the back door and it was open? One of the keys on the key ring fit the door, the back door. But the back door was open. They didn't have to use it to get in.  That is correct. All right. Thank you for your time. I feel I have an opportunity to make rebuttals.  I'm Mark Levine of the Office of the State Appellate Defender, representing the appellees Delmi Rubio, Marco Hernandez, and Salvador Espinoza. The key point in assessing the state's argument, of course, is the standard of review. And the standard of review, as the state agrees, is whether it's the manifest way to the evidence standard. Now, most of the court's, I want to note that most of the court's findings are in the appendix to the state's brief. However, the first few pages are missing. They're in the record, of course, but I just want to note that that's not all the findings. The court found first that the duration of the traffic stop was unreasonably long. The court said it didn't take an hour for Officer Branham to do what he said he was doing, even though Espinoza presented a Mexican driver's license. Does the trial court ever abandon that particular position, even though this hearing was disjointed and took 16 months, these three hearings? The duration position? Yes. No, Your Honor. Actually, I think this came out most clearly on the motion for reconsideration. That's where I was just quoting from, because I think by then the law was clearer than it had been earlier in the proceedings. The state was then focusing on the duration issue, and the judge said, whatever the change in the focus and so on, he said, so I want to make it, this is quoting from the judge, he said, so I want to make it very clear that I think the true reason he was detained so long is he's not going to leave until Detective Spades came back and interviewed him for his part in the drug investigation. And the judge said that he wanted to make it very clear that he was talking about duration here, whatever other factors there might have been that had become inapplicable in the meantime. That does infer, though, that particular statement that there was a pretext to this stop that we shouldn't necessarily be considering, correct? Well, the stop was certainly, it was pretextual. There's no question about that, but there's also no question that that's okay. He made a, I think he turned without signaling or something like that. The initial stop, there's no problem with the initial stop. The problem was that he sat there for an hour, most of the time in the back seat of the squad car. Did the trial court implicitly find that the traffic stop was still ongoing when Spades began talking to the defendant? No. And the second part of that question, if you could answer both, is if it actually ended, and there could be an argument made that it ended, and that he wasn't re-seized, then really what are we talking about duration for? Right. Exactly. That was an argument that the State made in their brief. Let me speak to that. First, as to whether the stop was ongoing. Since we're on a manifest way to the evidence standard, the manifest way of the evidence was certainly not that it was over with. On page 416 of the record, Branham said that he gave the tickets after Spades and Rosso had talked to Espinoza. On 439 of the transcript, Branham said that he gave the tickets after Spades arrived, but before he talked to Espinoza. On page 440 of the transcript, Branham said, probably close to the same time Spades started talking to him, or in the process thereof. So Branham himself gave three different statements about when he gave the tickets, and all three of them were in conflict with Spades' testimony. Spades said that when he arrived, Espinoza had the tickets in his hand. None of Branham's statements agreed with that. So the judge had good reason for doubting, for suspecting there might be credibility problems over here, as he assessed the credibility of these witnesses. Second point is, regardless of that, whether the stop had ended or not, and I'm not, the stop hadn't ended, and I think you're right, I think the judge did implicitly find that it hadn't ended. But even if it had ended, it's not, it wouldn't be against the manifest weight of the evidence that Espinoza was either still or once again in custody at the time that he gave the consent to the search of the house. Spades testified, this is on 228 of the record, he says, we walked him, Espinoza, we walked him back, back to our unmarked police vehicle and asked him to sit in the back. That's after he said he talked to the officers, correct? Or after he indicated to him? This is when Spades arrived. Spades had been back doing surveillance at the house. Now we don't know why he was doing surveillance there. Presumably he didn't think he was wasting his time. Presumably he thought he needed to be over there and came back when he could. I don't know, the record doesn't show that. The point is, he wasn't there until he finally came back. When he comes back, he comes back with Rosso and he testifies, Spades testifies, we walked him, Espinoza, back to our unmarked police vehicle and we asked him to sit in the back. At that time, and it was soon after that, 10, 15 minutes, I don't remember the exact time after that, that consent to search the house was given. When that consent was given, there were three officers present. Spades, Rosso and Branham. Viola had at that point gone away. Two of these officers were in uniform, all of them were armed. Espinoza is sitting, as I said, in the back seat of a squad car. Officer Branham had Espinoza's car keys. Remember the record says he held them up and asked Espinoza, would any of these keys on this key ring, would any of them fit the house? And also, as in the Conventon case, or however you pronounce that, Espinoza was made to know that he was the target of a drug investigation when he's sitting in the back seat of the squad car. On page 233 of the record, Spades testified that he told Espinoza that police had information that marijuana was being sold at the Brook Road house, that he, Espinoza, had been seen there, and he told Espinoza that it was important for him to be truthful for them. Now, no one from this planet at that moment would have thought that he was free to get up and leave. Hispanic, non-Hispanic, nobody. Now, from the back seat of the squad car, with three policemen there telling him that he's the subject of a drug investigation, nobody would have thought he was free to leave, and it certainly would not have been contrary to the manifest way of the evidence for the judge to conclude that Espinoza did not think he was free to leave. And this is dispositive. Consent to search was given while he was in custody. In addition to this, the judge went on to find that regardless of all these other points, Espinoza didn't voluntarily give consent for all the reasons the state was talking about, his inability with English and all of those things. Is that what the possibly vulnerable, subjective state of the person, is that what you're talking about? Whether you used those terms in referring to that case? Whether he gave consent, but as I say, we don't even need to reach this point because he was, it wasn't against the manifest way of the evidence that he was in custody. It was undisputed that no Miranda warnings had been given at that point. So you're not talking about the fact that he has a Hispanic background, and although he may speak English fairly well, he doesn't understand. You're talking about raw circumstances. And as you said, any person on the planet. So your argument does not relate. As counsel said, the trial court seemed to focus on Mr. Espinoza's Hispanic background. I think those could be considered make weight arguments. If I'd be standing up here arguing it if I didn't have stronger arguments, which I've made. I don't say they're not factors, but there's much stronger factors over here. The other point was that even if he weren't in custody, and even if he had voluntarily consented, the third point was whether he had actual or apparent authority to give consent. And as I say, I argued that in the brief, but that needn't even be breached because the earlier parts are dispositive. I'll ask you the same question. Did any of the keys in fact fit? There was a disputed fact on that. Counsel is correct that, I forget, was it Brim? I forget which of the officers said he found that the door was open, but just to see whether the key would fit, he tried it and it worked. I think Espinoza testified that they tried it and it didn't work, and so they kicked in the door. I don't know. It doesn't matter. These keys to the house, by the way, having keys to the house, does this show authority to the house? These keys were on the same key ring as the keys to the car that he borrowed. Espinoza testified that he was going to the store to buy some water, and the owner of the house, Delmi Rubio, or not the owner of the house, but the car was registered, the owner of the car, police knew that it was registered to Delmi Rubio. They'd seen this car parked at the house before. Spades testified he'd seen it there several days before this came up. There's absolutely no reason to think this was a stolen car. People lend cars to one another sometimes. That's not as suspicious of them. So the keys to the house, not surprisingly, were on the same key ring as the keys to the car. Well, if he had permission to drive the car, wouldn't it then follow that he had permission to enter the house and bring people with him, if he so desired? Well, not necessarily, just because he has permission to. Did the trial court make specific findings relative to this issue? Yes, I believe they did, and I'm reluctant to say that strongly now because the focus of my argument is on the other parts because I don't think we even need to get into this. But from my memory of it, I think the court did make findings of fact on that, but I don't want to say that. On the second issue, going back a little bit, if that's okay, you indicated that because he was in custody, he was in the back of the squad car when they asked him for consent, it was a Miranda violation. I don't really see that argument flushed out in your number two, under your heading, in number two of your brief. It's a Miranda violation. It's a voluntariness issue, and that's a factor to be considered, and I understand that. I understand the court found that the consent was involuntary. The court made no findings about Miranda violations or anything like that. My point only is that there was undisputed that he hadn't received Miranda warnings. I'm not resting on that as an argument, though. That's undisputed. But you're resting on the voluntariness, the court's finding that it was involuntary. Yes, it was presumed involuntary because he was in custody, and no one could possibly have felt free to leave under these circumstances, seated in the back seat of the squad car, having been told that he's the subject of a drug investigation. Right. I'm just trying to get my head around this, because when you're talking about seizure and seizing a person, you would agree that someone who was seized and in custody can give a voluntary consent, correct? I mean, that happens all the time. I mean, someone who's stopped and arrested, they can give a voluntary consent, correct? Mm-hmm. I mean, it just, I mean, again, it seems like both of these are focusing on the seizure aspect as did the court to some extent, but it's more than just whether he was seized or not. I mean, you indicated earlier that that was dispositive, and maybe I'm just missing something. How is it, whether he's seized or not seized, how is that dispositive on the issue of the voluntariness of the confession? Because if someone is seized, they can still give a voluntary consent. I mean, voluntariness of the consent. Right. Here's the point, I think. He's seized unlawfully at the time he gives his consent. Certainly someone who's lawfully in custody can't consent to something. He could have consented if this stop had taken 5, 10, 15 minutes of whatever reasonable time, or if the court had found, yes, he could have consented. The point is he was in custody unlawfully. He was seized unlawfully at the time that he gave the consent. Well, then it's a fruit of the poisonous tree argument. I'm sorry, I didn't hear you. Then it's a fruit of the poisonous tree argument. Precisely. Okay. I think your time's up, sir. Thank you very much, Your Honor. May it please the Court. Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. I have two very brief factual points to make. Mr. Espinosa was not told that he was under drug investigation during the time of the stop. The confusion arises from the fact that when in the transcript prior to earlier on, Officer Spades certainly believed that Espinosa was a suspect in a drug investigation. But as far as what he told Mr. Espinosa, he did not tell him that he was under a drug investigation. And I think that is an extremely important factor in deciding. Did he tell him that the house was? He did not mention drugs to Mr. Espinosa. Okay, why did he want to go to the house? He didn't tell him why he wanted to go to the house. He asked him if he would consent to the charge. He said, we've been watching the house. I think he said something like, we know what's happening there. Or some vague something. We've seen what's... Well, we know we've been watching the house. We know what's happening there, or whatever the vagary might be. Are they running an illegal daycare? I mean, why is he telling him those things? That's what the record reflects, is that he did not tell him that he was involved in a drug investigation. That was why he wanted to talk to him. The transcript makes it so that's why he wanted to talk to him. But he did not tell that to Mr. Espinosa. Regarding the trial court's finding of whether the traffic stop was finished, it's not very clear. But I am reading from my notes. I have to tell this court that I completely briefed this case for Mr. Hernandez. And then someone said, oh, we need to consolidate all of these cases. So the citation that I know I'm correct for is in Mr. Hernandez's case, which is at page 602. That says that Mr. Officer Brannon issued... This is the trial court's findings. Officer Brannon issued three citations to Mr. Espinosa. Officer Brannon said the citations were not given until right about when Detective Spades arrived. Detective Spades said they had already been issued when he arrived. So he doesn't really decide it, but basically his conclusion, which I think is probably a pretty accurate conclusion, is that they were pretty close in time. But as our court noted in Cosby, they can be very close in time, and there's nothing wrong with that. I would like to spend just a little bit, or the few minutes I have remaining, on the consent research. And I want to say this briefly so I know I get it out. There was actual authority from Mr. Espinosa to consent to this search. We need not go into apparent authority. And the reason this is so important is because this information is contained in the transcript, which the judge said, I don't remember anything about that. Was that Russo? Russo's testimony? Or whose particular testimony was it? Yes. The trial court said that he had not read the transcript from the hearing where Espinosa and Detective Russo testified. He said he didn't remember anything about it. It was actually only about two months before his ruling, so you'd think if he was going to forget something, it wouldn't have been that. But he had not read the transcript, and he said on the record that he didn't remember anything in it. In that hearing, Detective Russo said that Espinosa had met a man named Carlos Lopez, who was his cousin, in Colorado several months earlier. At that time, Lopez housed Espinosa in the Brook Road house, paid him $1,300 a month to take care of the house for him. So Espinosa did live in that house. He was, if nothing, he had actual authority. He certainly had common authority. He has been housed in this location for several months. And I think the law of apparent authority applies here, and we need not go any farther. Now, in their reply brief, or in their brief, the defendant argues that this was not raised below. I don't think you have to raise below the fact that evidence is here and you didn't think about it, you didn't consider it. The fact that he could have gone back and read that transcript afterwards, knowing that he'd missed a key point. And in any case, certainly this court can apply the plain error to a state appeal. And if ever, I think not considering crucial evidence, including an entire hearing, is an error so serious that it offends the integrity of the judicial process. Any more questions? Thank you. Thank you. Your time is up. Please be taken.